**SCA SERVICES OF INDIANA, INC., Plaintiff,**

v.

**Lee M. THOMAS, as Administrator of the United States Environmental Protection Agency, and the United States Environmental Protection Agency, Defendants.**

Civ. No. F 86–72.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 9, 1986.

Joseph V. Karaganis, Chicago, Ill., James P. Fenton, Fort Wayne, Ind., for plaintiff.

Robert Schaefer, Regional Counsel, US–EPA Region # 5, Chicago, Ill., Beth S. Ginsberg, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., David H. Miller, Asst. U.S. Atty., Fort Wayne, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by the defendants (collectively, "the EPA"), and motions for a tempo-rary restraining order, preliminary injunction and summary judgment filed by the plaintiff ("SCA"). A hearing was held on all motions on April 10, 1986. For the following reasons, the motions for temporary restraining order and preliminary injunction will be denied as moot. The Rule 12(b)(1) motion to dismiss will be denied. The Rule 12(b)(6) motion, converted to a motion for summary judgment, will be granted. The plaintiff's motion for summary judgment will be denied.

This cause arises out of certain administrative actions taken by the EPA concerning property owned by SCA known as the Fort Wayne Reduction Dump ("the Dump"), a closed landfill where certain potentially toxic substances have been stored. The parties are in agreement over the basic facts of this dispute. Acting under the auspices of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the EPA, in October 1984, published notice that the Dump had scored a 42.47 score on the agency's Hazardous Ranking System ("HRS") so as to qualify for inclusion on the National Priorities List ("NPL"), which would make the Dump what is popularly known as a "Superfund" site. SCA protested the ranking score, and requested that it be granted a hearing before a neutral tribunal to try the contested factual issues arising out of the ranking score. The EPA has refused to grant such a hearing. To this date, the site has not been listed on the NPL.

In May 1985, the EPA sent a letter to SCA stating that it was considering beginning a Remedial Investigation ("RI") and a Feasibility Study ("FS") to determine what types of action should be taken to clean up the Dump. It checked with SCA to see if SCA would want to undertake the study, thereby avoiding the possibility of SCA having to pay for the EPA's study under § 107 of CERCLA. The EPA requested that SCA sign a consent order under § 106 of CERCLA in order for SCA to do the study. SCA expressed a willingness to perform the study despite the Dump not being listed on the NPL, but refused to sign the

§ 106 consent order. EPA then indicated that it would go ahead with the federally-financed RI/FS.

On February 20, 1986, SCA filed this action, seeking declaratory and injunctive relief. The complaint alleges two constitutional improprieties with CERCLA and its application by EPA to the Dump. The first involves due process; SCA contends that CERCLA is unconstitutional for its failure to provide a hearing prior to placement on the NPL. The second involves separation of powers. SCA argues that EPA's attempts to "force" SCA to sign a § 106 consent order, the conducting of a RI/FS prior to placement of the Dump on the NPL, and the attempts to gain access to the Dump site for purposes of conducting the RI/FS all violate the separation of powers doctrine.

The EPA has now moved to dismiss the complaint, arguing that this court lacks subject matter jurisdiction over this controversy, that certain aspects of the controversy are not ripe for adjudication, and that SCA has failed to state a claim. SCA has moved for summary judgment on the merits of its case, as well as for a temporary restraining order and preliminary injunction when it appeared possible that EPA would issue its updated final NPL prior to the time the court could rule on the motion for summary judgment. Because the listing on the NPL has not yet occurred, and the court today issues its ruling on the merits of this cause, the temporary restraining order and preliminary injunction are not needed for a complete adjudication of this controversy, and are therefore deemed moot. The court will analyze EPA's subject matter jurisdiction and ripeness arguments first, and then treat the motion to dismiss and the summary judgment motions together. In order to understand the arguments raised by the parties, however, it is first necessary to briefly set forth the statutory framework within which EPA carries out its duties under CERCLA.

Congress enacted CERCLA in 1980 in response to increasing concern over the severe environmental and public health effects from the improper disposal of hazardous wastes and substances. *Eagle-Picher Industries v. EPA*, 759 F.2d 922, 925–26 (D.C.Cir.1985). CERCLA authorizes EPA to respond to the release or potential release of hazardous substances which "may present an imminent and substantial danger to the public health or welfare." Section 104(a)(1), 42 U.S.C. § 9604(a)(1). The EPA's response can be one of two kinds: a "removal" action, which involves an immediate, actual cleanup of a hazardous substance release, § 101(23), 42 U.S.C. § 9601(23); or a "remedial" action, which are actions "consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." Section 101(24), 42 U.S.C. § 9601(24). Whichever form of response action is taken, it must be "consistent with the national contingency plan," the plan mandated by § 105, 42 U.S.C. § 9605, to "reflect and effectuate the responsibilities and powers created by this chapter ...." This "response" authority is found in § 104 of CERCLA.

In addition to § 104 response powers, EPA has the power to request that the Attorney General bring an action to secure relief to abate "an imminent and substantial endangerment to the public health or welfare or the environment because of an action or threatened release of a hazardous substance ...." Section 106, 42 U.S.C. § 9606.

Section 107 of CERCLA empowers the EPA to recover all costs of removal or remedial action incurred by the United States Government or a state from all responsible persons, including owners of the site where the action took place.

## SUBJECT MATTER JURISDICTION

■ As noted above, SCA alleges two constitutional deficiencies with CERCLA. EPA argues that this court lacks subject matter jurisdiction over this case because CERCLA provides for judicial review for the types of claims raised by SCA. EPA

contends that the complaint about placement on the NPL can be brought in the Court of Appeals for the District of Columbia Circuit by virtue of a § 113, 42 U.S.C. § 9613, challenge to a regulation. EPA also urges that a complaint about the conduct of a RI/FS cannot be judicially reviewed until the EPA brings a cost recovery action under § 107, 42 U.S.C. § 9607, of CERCLA. Thus, EPA concludes that it is inappropriate for this court to consider SCA's complaint at this time.

EPA's subject matter jurisdiction argument misconstrues the fundamental thrust of SCA's complaint. If SCA were challenging EPA's actions within the statutory framework of CERCLA, then the provisions of § 113 or § 107 may play an important role in deciding where and when SCA could raise its objections to EPA's actions. However, SCA is challenging the constitutional sufficiency of CERCLA itself. This court clearly has jurisdiction to consider a constitutional challenge to a federal statute under 28 U.S.C. § 1331. *See Industrial Park Development Co. v. EPA*, 604 F.Supp. 1136, 1140 (E.D.Pa.1985) ("Of course, there is no question that a federal district court has original jurisdiction under 28 U.S.C. § 1331 to consider the important questions arising under the Constitution and statutes of the United States" in a challenge to actions of EPA pursuant to a § 106 order).

In addition, § 113(b) of CERCLA gives the district courts jurisdiction over any controversy under the Act other than a controversy involving the promulgation of a regulation (for which jurisdiction is vested exclusively in the D.C. Circuit—*see* § 113(a)). It would seem that a challenge to the constitutionality of an action taken under CERCLA, as opposed to a challenge to the statutory propriety of the action, would fall within the jurisdictional proscriptions of § 113(b). This distinction was noted in *Aminoil, Inc. v. EPA*, 599 F.Supp. 69 (C.D.

Cal.1984), where the court recognized that a challenge to the merits of an administrative order is precluded by the judicial review provisions of CERCLA, but that a challenge to the constitutionality of a provision of CERCLA is within the district court's jurisdiction under § 133(b). *Id.* at 71–72. *See also Wagner Electric v. Thomas*, 612 F.Supp. 736, 741 (D.Kans.1985).

EPA argues that the process of listing a site on the NPL is rule-making, and thus a challenge to the listing must be taken up in the D.C. Circuit because of § 113(a). Yet the *Aminoil* court's distinction points out EPA's misunderstanding of SCA's complaint. SCA has repeatedly stated that this suit does not seek to challenge the 42.47 HRS score assigned to the Dump; rather, it sues to obtain an opportunity to challenge the score in a manner that is consistent with what it contends due process requires. In the parlance of *Aminoil*, SCA does not, in this court, seek review of the merits of the NPL listing process, but rather seeks to challenge the constitutionality of that process. Thus, SCA does not challenge the promulgation of a regulation (if listing on the NPL can be considered such), but rather challenges the constitutional propriety of the process by which such a regulation is promulgated. The former would fall within the strictures of § 113(a), but the latter falls within the general jurisdiction grant of § 113(b).[1]

The same conclusion is reached with regard to the challenge to the RI/FS. If SCA were challenging the manner in which the study was being conducted (for example, that the methods chosen are too expensive, or more extensive than necessary), such a challenge would have to wait until EPA brought a § 107 cost recovery action. Courts have made it clear that complaints about or challenges to the manner in which response actions such as a RI/FS are carried out cannot be made until the EPA

---

1. This is not to say that the issue raised by EPA—whether listing on the NPL is a regulation—is irrelevant to this case. As will be explained more fully later in this order, the nature of the NPL listing process, and the corollary issue of whether the exclusive jurisdiction of § 113(a) can be invoked, is vital to the question of whether CERCLA provides SCA with sufficient due process protection. It is in the context of this due process issue that the court will consider the regulation/adjudication issue raised by the parties in the briefs.

brings a cost recovery action under § 107. *See Wheaton Industries, Inc. v. EPA,* 781 F.2d 354, 356 (3d Cir.1986); *Lone Pine Steering Committee v. EPA,* 777 F.2d 882, 886–87 (3d Cir.1985); *J.V. Peters & Co., Inc. v. Administrator, EPA,* 767 F.2d 263, 264–66 (6th Cir.1985); *United States v. United Nuclear Corp.,* 610 F.Supp. 527, 528 (D.N.M.1985); *Cotter Corp. v. EPA,* 21 Env't Rep.Cas. (BNA) 2231, 2232 (D.Colo. 1984). Yet SCA is not making such a challenge. Rather, it is contending that EPA's decision to conduct the RI/FS on its own violates the constitutional separation of powers doctrine—a challenge to the *fact,* and not the *manner,* of the RI/FS. This court clearly has jurisdiction over a constitutional challenge to an agency's action under a statute.

It is true that the cases cited above speak in rather generic terms about "pre-enforcement judicial review" of actions like a RI/FS. In *Lone Pine,* the plaintiffs had argued that they were entitled to judicial review of the EPA's decision to proceed with its own response plan because there was no declared emergency. The Third Circuit held that

> The statutory approach to the problem of hazardous waste is inconsistent with the delay that would accompany pre-enforcement review. Thus, although not explicitly stated in the statute, we find in § 9604 [§ 104 of CERCLA] an implicit disapproval of pre-enforcement judicial review. That policy is not limited to emergency situations but applies to remedial actions as well.
>
> Section 9607 [§ 107] provides an adequate opportunity for the alleged responsible parties to object to the cost and adequacy of response actions.

777 F.2d at 886–87. In *Wheaton,* the plaintiff argues that EPA's refusal to allow it to perform its own RI/FS merited immediate judicial review. The Third Circuit was not convinced, finding that the *Lone Pine* holding that pre-enforcement judicial review was unavailable applies to Wheaton Indus-

tries' claim as well. However, both of these cases are clearly operating within the statutory framework—that is, they are deciding whether *under CERCLA* review is possible prior to a § 107 action. SCA's claims look outside the statute to the Constitution, challenging the statute itself on constitutional grounds. Therefore, these cases are inapposite.[2]

Thus, this court has jurisdiction over this cause by virtue of 28 U.S.C. § 1331 and § 113(b) of CERCLA. The motion to dismiss for lack of subject matter jurisdiction will therefore be denied.

## RIPENESS

EPA urges a second reason for dismissal: that none of SCA's claims are ripe for adjudication at this time.

The doctrine of ripeness arises out of article III of the Constitution, which requires the existence of an actual case or controversy and prohibits the rendering of advisory opinions. *See Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin,* 747 F.2d 407, 410 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). Ripeness is a prudential question, *American Booksellers Ass'n., Inc. v. Hudnut,* 771 F.2d 323, 327 (7th Cir.1985), and although the difference between an abstract question calling for an advisory opinion and a ripe case or controversy is not discernable by any precise test, *Babbitt v. United Farms Workers National Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), the basic inquiry is whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality, so as to warrant judicial relief. *Babbitt,* 442 U.S. at 198, 99 S.Ct. at 2308; *American Booksellers Ass'n.,* 771 F.2d at 327. A case is not considered ripe if the issues are not formed or the application of a challenged statute or regulation is not certain, *Wisconsin's Environmental Dec-*

---

**2.** As was noted above, *see* note 1 *supra,* whether SCA can raise all of the issues raised here in a § 107 action goes to the issue of the sufficiency of the process afforded SCA and CERCLA. It

does not indicate that this court has no jurisdiction to consider a constitutional challenge to CERCLA itself.

*ade*, 747 F.2d at 411. A plaintiff must demonstrate a "realistic danger of sustaining a direct injury" as a result of the defendant's action, although he need not wait until the injury is consummated if it is "certainly impending." *Babbitt*, 442 U.S. at 298, 99 S.Ct. at 2308; *Fort Wayne Patrolmen's Benevolent Ass'n. v. City of Fort Wayne*, 625 F.Supp. 722, 725 (N.D. Ind.1986); *Lartnec Inv. Co. v. Fort Wayne-Allen County Convention and Tourism Auth.*, 603 F.Supp. 1210, 1216 (N.D.Ind.1985).

The ripeness question manifests itself here in two different ways. In SCA's due process claim, the essential first element of a due process analysis is the assertion of a property or liberty interest that is being deprived by the government's action. In order for the due process claim to be "ripe," SCA must show that it is currently suffering some injury which it claims to be a protected property or liberty interest. Whether or not the injury actually is a recognized liberty or property interest for due process purposes is immaterial to the ripeness analysis, for such a question goes to the merits of the claim, while the ripeness doctrine is concerned only with whether a present controversy exists.

The separation of powers argument requires a different focus for ripeness analysis. For this claim, it is less important that some actual injury be alleged, in part because the essence of the claim is that EPA acted outside of its statutory powers and thereby violated the separation of powers between the executive and legislative branches. The ripeness doctrine would instead be satisfied, and the controversy found "ripe," if the alleged acts of the EPA have actually occurred or are sufficiently certain to occur so as to present a real case or controversy over the propriety of those acts.

The court will therefore analyze the ripeness issues raised under these two claims separately.

## A. Due Process Claim

■ An examination of SCA's complaint and memoranda reveals direct or inferential claims of three different injuries as results of EPA's actions concerning the possible listing of the Dump on the NPL: damage to SCA's business reputation; loss of business goodwill; and loss of property value for the Dump site.[3] In addition, one claim of economic loss as a result of the conduct of the RI/FS has been made which has due process implications: a loss of the use of the Dump site while a RI/FS is conducted and remedial work carried out. The court will analyze each of these injuries in turn.

### 1. Damage to SCA's Business Reputation

SCA alleges in its complaint that EPA's listing of the Dump on the proposed NPL has "placed a severe economic cloud on [SCA's] property. EPA's claim has been widely publicized and [SCA's] property has been publicly labeled a 'Superfund' site. Such labeling by Defendant causes major economic injury to [SCA]: 1) Being labeled as an owner of a 'Superfund' site has a negative effect on [SCA's] business reputation ...." This reputational harm was de-

---

**3.** To a certain extent, the issue of ripeness overlaps with the court's inquiry into the existence of a property or liberty interest for due process purposes. In fact, much of the discussion in the briefs about SCA's alleged injuries is found in the sections of the briefs dealing with whether there is a property or liberty interest worthy of due process protection. (The other main source was found in the "irreparable harm" discussion of the standards for granting a preliminary injunction). However, it is possible for an alleged injury to be ripe even though that injury will not legally support the request for relief. Thus, for example, SCA's business reputation may be damaged, thereby making a claim based on that injury "ripe" for review, even though damage to reputation alone may not be a protectable property or liberty interest. This distinction has not been recognized in the briefs, and has resulted in a confusing discussion about the ripeness issue. For purposes of this analysis, the court restricts its discussion to the issue of whether SCA has adequately alleged injuries that are real and present so as to make a claim based on those injuries "ripe" for present consideration. The legal consequences of those injuries are analyzed elsewhere in this order.

scribed as follows in the affidavit of William P. Hulligan, a SCA Vice President:

[T]he harm to the Company's reputation and goodwill from designation of the Site on the NPL as a "Superfund" site would be major and irreparable ... The "Superfund" listing of the site will seriously damage the business goodwill and reputation of the Company. An important aspect of the business goodwill and reputation is the Company's ability to dispose of customers' wastes in an environmentally sound manner. Listing of the Site on the NPL will severely impair public confidence in the Company's environmental integrity and will lead to an immediate and continuing loss of customers ...

The damage to the Company's reputation and goodwill ... will extend beyond the Company's customers to regulatory authorities. Whenever the Company seeks to open or continue operation of a sanitary landfill operation or other waste disposal facility needed by the public, the Company is required to obtain a variety of permits and approvals from federal, state and local authorities. During the approval process, the integrity of the Company and its commitment to environmental protection are at issue. "Superfund" designation of the Company's Site will severely impair the Company's environmental credibility with the regulatory agencies.[4]

Hulligan's affidavit is unrefuted by EPA. Instead, EPA chooses to argue that the "stigma" (if any) from being a "Superfund" site owner attaches at a much later time, and thus no injury is present now. EPA cites *U.S. Ecology, Inc. v. Carlson*, 21 Ent't Rep.Cas. (BNA) 2009 (C.D.Ill. 1984). In that case, the plaintiff sought an injunction against the inclusion of its name on the proposed NPL, arguing that the stigma caused by such inclusion would constitute irreparable harm. The court disagreed:

Plaintiff pleads the existence of an adverse "stigma" that will result from inclusion on the proposed NPL. But the existence of such a "stigma" is predicated on an argument that the official pronouncement of the government's proposed action will so befuddle Plaintiff's business associates as to lead them to conclude that Plaintiff is undoubtedly guilty of operating an illegal hazardous waste facility and is therefore liable for the expense of cleaning it up. As Plaintiff's brief amply demonstrates, such a conclusion is not so easily drawn. The individuals, corporations, and government agencies with whom Plaintiff does business are sufficiently sophisticated to know that the "stigma" of operating an illegal waste site will only attach after a sixty day comment period on the proposed NPL and any subsequent appellate review Plaintiff seeks.

*Id.* at 2010.

This case is not dispositive of the issue before the court, despite EPA's belief to the contrary. In *U.S. Ecology*, the plaintiff was complaining of a *possible* stigma from placement on the proposed NPL. Here, SCA has alleged that a stigmatization has already occurred—the Dump has been publicly labeled a "Superfund" site even though it is not yet on the final NPL. Thus, the stigma in this case is much more real than in *U.S. Ecology*. Further, the "stigma" alleged in *U.S. Ecology* is that of "guilt"—that the plaintiff was "undoubtedly guilty of operating an illegal hazardous waste facility." Here, SCA alleges a much more subtle kind of "stigma"—the inability to properly perform the job of waste disposal. This stigma could have very real consequences for SCA's business. Because a person who arranges for the disposal or treatment of hazardous wastes at a facility owned or operated by another can ultimately be liable for the costs of cleaning up the

---

**4.** The Hulligan affidavit speaks in terms of harms resulting from listing on the NPL, which has not yet officially occurred. However, this poses no ripeness problem because the harm described by Hulligan is that which flows from the designation of the Dump as a "Superfund" site, an event which the complaint states occurred after the listing on the proposed NPL. Thus, the harms described in the affidavit can be assumed to be occurring now for ripeness purposes.

wastes at the facility, § 107(a)(3), potential customers with wastes to dispose might be hesitant to deal with a company which has a reputation for not properly disposing of wastes at other sites. Thus, it may well be possible that the designation of the Dump as a "Superfund" site will lead to what Hulligan called "an immediate and continuing loss of customers."

If the state of the record were different, *U.S. Ecology* might have nevertheless persuaded the court that no present damage to SCA's business reputation can be inferred from the listing on the proposed NPL or even a listing on the final NPL. Presumably, SCA's present and potential customers, as well as the governmental licensing agencies with which SCA deals, are sophisticated and knowledgeable in the operation of CERCLA (or at least they should be, if they are involved with waste disposal). They should know that both Congress and the EPA view the NPL as a preliminary stage which does not determine liability or require any action:

> The priority list serves primarily informational purposes, identifying for the States and the public those facilities and sites or other releases which appear to warrant remedial actions. Inclusion of a facility or site on the list does not in itself reflect a judgment of the activities of its owner or operator, it does not require those persons to undertake any action, nor does it assign liability to any person. Subsequent government action in the form of remedial actions or enforcement actions will be necessary in order to do so . . . .

Report of the Committee on Environment and Public Works, Sen.Rpt. No. 848, 96th Cong., 2d Sess., 60 (1980). *See also* 48 Fed.Reg. 40658 (Sept. 8, 1983) ("Inclusion of a site on the NPL does not establish that EPA necessarily will undertake response actions"). Such sophisticated customers of

SCA would understand that the listing on the NPL is but the first step in a long process of litigation, and the final conclusion that SCA was in fact liable for the hazardous waste problem at the Dump (and thus, inferentially, unable to properly dispose of the wastes stored there) is still a long way off, and certainly not a foregone conclusion.

However, the record before this court does not provide any information about SCA's customers for the court to find that no such reputational damage has yet occurred. The EPA has offered nothing to challenge the Hulligan affidavit,[5] and thus the factual assertions of the complaint and affidavit must be accepted as true for purposes of these motions. Those uncontested facts establish that designation of the Dump as a "Superfund" site, whether officially by a listing on the NPL or unofficially by public interpretation of the listing on the proposed NPL, has caused present damage to SCA's business reputation, thereby making a claim based on that reputational harm ripe for adjudication.

#### 2. SCA's Business Goodwill

The second alleged injury from listing on the NPL is damage to SCA's business goodwill. For purposes of this analysis, however, goodwill is closely related to business reputation. In Indiana, goodwill is defined as "that element of value which inheres in the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business. It is the probability that old customers will return to the old place of business." 14 I.L.E. Good Will § 1. *See Hart v. Smith*, 159 Ind. 182, 64 N.E. 661 (1902); *Smock v. Pierson*, 68 Ind. 405 (1879). In short, goodwill is the intangible asset of a business which measures the value of that business to its customers. Thus, whether one views it in terms of a

---

5. Whatever EPA's reasons were for failing to challenge Hulligan's affidavit with counter-affidavits, the court finds it incredible that EPA argues against the injury to reputation in light of the record in this case. Part of the problem is related to EPA's attempts to argue reputational damage in terms of property interests protected by the due process clause. This is one of several areas in which EPA confused legal concepts or arguments in its briefs and argument to the court. Such confusing and misdirected advocacy provided little assistance to the court in ultimately resolving the issues before it.

business' reputation or goodwill, the focus is on the same thing: the customers' opinion of the business. Because the court has held that claims based on the reputation of SCA are ripe, claims based on SCA's goodwill must also be ripe for adjudication at this time.

### 3. Loss of Property Value

SCA claims a third kind of economic damage from the possible listing on the NPL: the loss of value caused by the inability to sell the Dump site once it is designated as a "Superfund" site. The Hulligan affidavit sets out the harm quite clearly: "The moment the Company's property is listed, it would be stigmatized as a "Superfund" site. The Company would find it virtually impossible to sell, lease, develop or use the property."

The stigma at issue in this claimed injury is different from the stigma alleged in the claimed harm to SCA's reputation and goodwill, thus making EPA's apparent reliance on *U.S. Ecology* inappropriate. Here, the stigma generated in the minds of the general public becomes much more relevant. Whereas the court can assume a certain level of sophistication and knowledgeability on the part of customers of SCA's waste disposal services, the potential persons who might want to buy, lease, develop or use the Dump site includes many who would not be expected to have any particular knowledge about CERCLA. Thus, a designation that the site is a "Superfund" site can discourage such potential buyers or users, even though at present the Dump is only on a "proposed" list or that listing is only a preliminary step towards possible remedial action. Given the national concern about hazardous and toxic waste problems in this country—a concern which spawned CERCLA—it seems beyond dispute that the designation of property as

having a problem serious enough to warrant EPA and Superfund cleanup will mark that property as an unmarketable pariah for years to come.

The facts of the complaint and the Hulligan affidavit are undisputed that the listing on the proposed NPL in October 1984 resulted in public reference to the Dump as a "Superfund" site. Nor does the EPA attempt to suggest the possibility that listing on the final NPL will not occur; in fact, it states in its Supplemental Memorandum filed April 16, 1986 that, with the October 1984 listing, "EPA gave notice to the world that SCA was quite likely to be placed on the final list." Nevertheless, EPA argues that SCA's claim of reduced property value is speculative or not related to the listing on the NPL:

> SCA states that placement on the list will make it "virtually impossible to sell, lease, develop or use the property" ... It is more reasonable to speculate that any difficulty the company may experience in selling the property would stem from the undeniable fact that the site is known to be leaking hazardous chemicals and substances and is located in a floodplain. This fact does not turn on the NPL listing, nor does it change by the listing.

Supplemental Memorandum at 4. In short, EPA apparently believes that the unmarketability of the property is guaranteed by the presence of hazardous wastes, and that the listing on the proposed or final NPL is simply irrelevant to that change in property value.[6]

The court disagrees. The regulatory structure established by EPA has created a dividing line between those properties that require remedial action and those which do not: only those properties scoring more

---

**6.** Perhaps as an attempt to show that listing on the NPL does not affect the property value, or perhaps to show that the Dump is still marketable despite its listing on the NPL, EPA makes passing reference in its Supplemental Memorandum that Waste Management, Inc. purchased SCA in 1984. This fact is irrelevant for at least two reasons: (1) there is nothing to indicate that the corporate purchase took place *after* the October 15, 1984 listing on the proposed NPL.

Thus, the sale would not indicate that there are buyers willing to buy the Dump despite the potential listing stigma; (2) Waste Management bought a *company*, not an asset of the company. Its reasons for buying SCA might be influenced by the value or nature of its *total* assets, but that cannot be extrapolated to reveal any opinion about the marketability of a single asset of the target company.

than 28.50 on the HRS will be included on the NPL and slated for further attention. In effect, the EPA has created a definition for properties which are dangerous enough to warrant attention—properties with scores over 28.50. The corollary is that property below this threshold is considered safe enough by the EPA so as not to warrant further action under a statute designed to protect the public from hazardous wastes. Thus, a potential buyer or user of a property that has scored below 28.50 on the HRS has some degree of assurance that the property is safe (at least by EPA standards). True, some buyers may be frightened away by the fact that there are some kinds of wastes on the property, but it is not inconceivable that some buyers would be satisfied that a property is safe because of a below threshold score on the HRS. Perhaps unwittingly, the EPA has created a yardstick which can result in property being marketable despite the presence of some hazardous substances on the site, and a listing of the site would have the effect of wiping out this marketability, thereby imposing a loss of the economic value of that marketability. Although it may only be incremental, there is nevertheless a palpable loss imposed by designating the property as destined for the NPL.

Here, the EPA has tentatively assigned a score of 42.47 to the Dump and placed it on the proposed NPL, indicating that the Dump will "quite likely" end up on the final NPL. In short, the EPA has made the Dump unmarketable by taking away the marketability of the Dump which would have existed prior to the issuance of the score. That is a present loss for purposes of ripeness.

The loss becomes even more apparent if one assumes that SCA is correct in its complaints about the HRS score assigned to the Dump—an issue that, although not directly before this court, has nevertheless been presented as the reason why SCA seeks review of the HRS score prior to listing on the NPL. According to SCA, a large part of the 42.47 score is based on what SCA views as a geologic impossibility—that ground water which EPA claims could reach the River Haven community

would have to "cross the Maumee River twice and flow uphill." SCA contends that if this "demonstrably false factual claim" were corrected, and the Dump's HRS score adjusted accordingly, it would fall below the 28.50 threshold, and thus not justify placement on the NPL. If such a change in the scoring of the Dump could be effectuated, then the Dump would change from property that is considered unsafe and unmarketable (because of its high score and presence on the NPL) to property which has at least some marketability because it is below the safety threshold established by the EPA.

Of course, whether SCA can succeed on the merits of its claim is irrelevant to this court's proceedings. However, the above analysis does indicate that SCA had something to lose when EPA issued its HRS score and proposed listing the Dump on the NPL. That injury is present and discernable, even if it cannot be measured in exact dollar amounts. SCA had some kind of interest it believes deserved due process protection, and for purposes of this court's ripeness analysis that is sufficient to constitute a ripe controversy.

4. Loss of the Use of the Dump Site During EPA Study and Clean Up

SCA argues that it will be injured by a loss of the use of its property during the EPA's conducting of the RI/FS and the subsequent remedial action to clean up the site. The right to use one's property as one pleases is clearly a right of property ownership. SCA contends that the conduct of the RI/FS and the possible subsequent response action to clean up the Dump site necessarily encumbers that right. Thus, SCA believes that it is entitled to due process protection prior to the deprivation or encumbrance of that right. Without examining the merits of the claim at this time, the court agrees that SCA's right to use the Dump site is presently encumbered because the EPA has already begun the RI/FS, even if it has not yet actually entered onto the site. It seems obvious that SCA cannot use the property for much while such a study is in progress, for access and possible clean up actions may

eventually occur. Thus, a due process claim based on the encumbrance of this right of use is a real and present controversy so as to be ripe for adjudication.

B. Separation of Powers Claim

■ SCA claims that three actions by EPA in the conduct of the RI/FS violates that separation of powers doctrine: (1) the placing of allegedly illegal conditions on SCA's right to perform the RI/FS and the subsequent response work; (2) conducting the RI/FS prior to placement of the Dump on the NPL; and (3) seeking entry onto the site to conduct the RI/FS. As was noted above, the ripeness analysis requires only that the court finds that the alleged actions took place—their legal sufficiency will be analyzed elsewhere.

The two allegedly illegal conditions placed on SCA's right to perform the work itself were the signing of a § 106 consent order and the signing of an open-ended financial obligation. EPA does not contest that it requested both of these conditions in its negotiations with SCA. EPA attempts to claim that the issues concerning a § 106 order are not ripe because no such order has been issued, but that argument misses the point. SCA does not contest the merits of a § 106 order because it admits no order was actually issued. Rather, it argues that EPA's *insistence that SCA sign a § 106 order* was improper, and certainly that issue is ripe for consideration because that insistence did occur. Thus, the "illegal conditions" aspect of SCA's separation of powers claim is ripe.

■ Likewise, there is no factual dispute that EPA has begun the RI/FS although the Dump is not yet on the NPL. That aspect of the claim is also ripe. The only real conflict is whether the issue of EPA's seeking access to the site is ripe for adjudication. SCA admits that EPA has not formally sought to gain access to the site yet; the RI/FS is apparently only in a planning and bidding stage. EPA claims that the issue of its right to access will not be ripe until it attempts to actually enter the site,

is refused entry, and seeks a warrant to enter.

The court agrees. There are several possible reasons why EPA might never seek access to the site. It may decide that SCA's comments are persuasive and not put the Dump on the final NPL. If the Dump is placed on the NPL, SCA may prevail in a review of that decision. When EPA actually seeks entry, SCA can refuse and then contest EPA's power to enter in a proceeding to issue a warrant to allow entry. Such a proceeding can then be appealed. Thus, entry onto the site is not as "inevitable" as SCA claims, and there are several potential obstacles in EPA's path. Because EPA has not yet sought entry onto the site, and because it may not be able to seek entry for a number of reasons, the claim challenging EPA's right to enter is simply premature at this time. It will therefore be dismissed as not ripe for adjudication.

Thus, the court finds that SCA's due process claim is ripe as it pertains to the damage to SCA's business reputation and goodwill, the dimunition of the Dump's property value and the use of the property during the RI/FS and subsequent response action. The separation of powers claim is ripe as to the claims relating to the illegal conditions placed on the right to perform the RI/FS and response action and to the performance of the RI/FS prior to placement of the Dump on the NPL. The court therefore turns to the merits of these claims.

MERITS OF THE CLAIMS

SCA has moved for summary judgment on the merits of its claims, while EPA has filed a motion to dismiss (although at times EPA requests that it be granted summary judgment). However, EPA's motion relies on materials outside the pleadings. When matters outside the pleadings are presented to and not excluded by the court, a motion to dismiss is converted into a motion for summary judgment. *See* Fed.R. Civ.P. 12(b)(6).[7]

---

7. At the first pre-trial conference held in this case, the court suggested, and the parties *agreed*, that if EPA's jurisdiction and ripeness

arguments failed, the case should be decided on cross-motions for summary judgment. The fact

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985). The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218–19 (7th Cir.1984). A party may not rest on the mere allegations of the pleadings or the bare contention that an issue allegations of the pleadings or the bare contention that an issue of fact exists. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir.1983). *See generally* C. Wright, *Law of Federal Courts*, § 99 (4th ed. 1983); 6 *Moore's Federal Practice*, § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips*, 710 F.2d 292, 296–97 (7th Cir.1983); *Collins v. American Optometric Assn.*, 693 F.2d 636, 639 (7th Cir.1982). *See also Bishop v. Wood*, 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

### A. Violations of Due Process

SCA argues that its right to due process under the fifth amendment has been violated by the process through which a site gets listed on the NPL. SCA contends that CERCLA is unconstitutional on its face and as applied in this case because of the failure to provide a hearing for a listing on the NPL.

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Due process has long required that when a party stands to suffer a deprivation of a liberty or property interest, it has a right to notice and an opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). It is fundamental to due process that the right to notice and the opportunity to be heard must be granted "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333, 96 S.Ct. at 902.

The general rule concerning the "meaningful time" for providing notice and an opportunity to be heard is that such process should be provided *before* the deprivation of the property or liberty interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *United States v. $8,850*, 461 U.S. 555, 562 n. 12, 103 S.Ct. 2005, 2011 n.

---

that both SCA and EPA submitted matters outside the pleadings—specifically, affidavits—and both requested that summary judgment be granted is further evidence that the parties understood that summary judgment would be the court's vehicle for deciding the case. Therefore, the parties had full notice of the court's intent,

and it can be reasonably assumed that they have submitted all they would have wanted to submit for the court's consideration. Therefore, this conversion of the motion to dismiss into a motion for summary judgment comports with the notice requirements of *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280–81 (7th Cir.1986).

12, 76 L.Ed.2d 143 (1983); *Fuentes,* 407 U.S. at 81–82, 92 S.Ct. at 1994–95. One exception to this rule exists: the government need not provide notice and a hearing prior to a deprivation of an interest in extraordinary or emergency situations. *United States v. $8,850,* 461 U.S. at 562 n. 12, 103 S.Ct. at 2011 n. 12; *Hodel v. Virginia Surface Mining and Reclamation Ass'n.,* 452 U.S. 264, 299–300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981); *Fuentes,* 407 U.S. at 90, 92 S.Ct. at 1999; *Polovchak v. Meese,* 774 F.2d 731, 736 (7th Cir.1985).

The "meaningful manner" requirement is less susceptible to a neat delineation in a single rule, in part because "no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause ... 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 483, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982), quoting *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 610, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406 (1974). Rather, the requirement of due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In general, due process requires some kind of "hearing" before the deprivation takes place. *Cleveland Bd. of Educ. v. Loudermill,* 105 S.Ct. at 1493; *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971); *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

The Supreme Court has repeatedly held that the "hearing" need not be elaborate—in fact, the Court has recently said that "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Bd. of Educ. v. Loudermill,* 105 S.Ct. at 1495. In fact, in that case, which involved the discharge of a school employee, the Court seemed to indicate that due process would be satisfied if the employee had received oral or written notice of the charges, explanation of the employer's evidence, and

an opportunity to present his side of the story. *Id.* at 1495. In *Mathews,* the Court analyzed several cases and found that only one, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), involving the termination of welfare benefits, had required a hearing closely approximating a judicial trial. *See Bell v. Burson,* 402 U.S. at 540, 91 S.Ct. at 190 (hearing "need not take the form of a full adjudication of the question of liability"). The Seventh Circuit has likewise adopted a view of the "hearing" as much less than a formal evidentiary venture:

> While the Constitution is unbending in its requirement that there be some form of hearing when a due process liberty interest is implicated, the formality and procedural prerequisites for that hearing may vary .... In its essence, a hearing demands that the person have the right to support his allegations by argument, however brief, and if necessary by proof, however informal.

*Endicott v. Huddleston,* 644 F.2d 1208, 1216 (7th Cir.1980).

SCA's due process argument is premised on the perception that the emergency/non-emergency distinction inherent in the Supreme Court's procedural due process analysis is present in CERCLA. According to SCA, CERCLA utilizes a "two tiered" structure: removal actions, under § 106 or § 104 removal authority, are designed to deal with emergencies where hazardous wastes post an "imminent and substantial" danger to the public health or welfare or to the environment; and § 104 remedial actions, which are designed for long term clean up of a site. Under SCA's logic, an "imminent and substantial" danger would justify immediate action by the government, and thus actions under § 106 or § 104 removal authority may be undertaken without a pre-deprivation hearing, provided a prompt post-deprivation hearing is provided. But because remedial actions are long range and performed more slowly, they lack the urgency of an emergency, and thus fall under the general rule of due process that a hearing must be held prior to a deprivation. Because CERCLA fails

to provide for a post-deprivation hearing in a removal context, and does not give a hearing prior to a deprivation in the remedial context, SCA contends that the statute is unconstitutional on its face. Further, because the EPA refused to give SCA a hearing on the HRS score assigned to the Dump, SCA concludes that CERCLA is unconstitutional as applied in this case.

The court begins its analysis of SCA's argument by first pointing out the SCA's claims concerning the constitutionality of CERCLA as applied to § 106 or § 104 removal actions is not before this court and will not be decided. It is factually undisputed that EPA has never sought to use its § 106 or § 104 removal authority to get the Dump cleaned up—in fact, that assertion is the essential premise to SCA's claim that it is entitled to a hearing prior to listing on the NPL. Yet precisely because this is not a contest about a removal action, this court's ruling on the procedural due process implications of CERCLA in removal situations would not assist in the resolution of SCA's claim about its treatment under CERCLA. To render a decision on the removal provisions would be to render an advisory opinion, something which this court is prohibited from doing under article III of the Constitution. Therefore, the court confines its focus to the issue of whether a pre-deprivation hearing is required in the context of a remedial action under § 104, and if so, what type of hearing is needed.

As noted above, SCA's claim is that the listing on the NPL will deprive it of liberty or property interests—reputation and goodwill,[8] the market value of the Dump site and the use of the site during a RI/FS and subsequent response action. As noted in the ripeness analysis, such an injury is present and would occur, thereby evidencing that the government action complained of would deprive SCA of a property interest under the fifth amendment. The question therefore becomes what process SCA is due.

SCA argues that the general due process rule—that a hearing is required prior to the deprivation—should apply here. The argument assumes that because this listing is occurring as part of a § 104 remedial action, this is not an emergency. There is some question about whether SCA's analysis of CERCLA is accurate. SCA appears to believe that "emergency" for due process purposes is merely a function of the time frame of government action—if the government must act quickly, then the problem is an emergency; if the government does not act quickly, then the problem must not be an emergency. From a common sense perspective, such a view might make some sense. Yet the Supreme Court has indicated that "emergency" may be a function of the subject matter of the action as well as the celerity of the government. In *Hodel v. Virginia Surface Mining and Reclamation Assn.*, the Court stated that "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is 'one of the oldest examples of permissible summary action.'" 452 U.S. at 300, 101 S.Ct. at 2373, quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950). The Third Circuit, in rejecting a claim that pre-enforcement judicial review

---

**8.** The Supreme Court has held that reputation alone is neither a liberty or property interest sufficient to invoke procedural due process. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976). Thus, the claim based on the damage to SCA's reputation must be rejected because there is no protectible interest involved.

The claim based on loss of goodwill, however, is more complicated. Goodwill has generally been considered an incident of the property of a business. *Miller v. Ortman*, 235 Ind. 641, 136 N.E.2d 17, 34 (1956); *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 410–11, 127 N.E.2d 235, 240 (1955); *American Shippers Supply Co. v. Campbell*, 456 N.E.2d 1040, 1043 (Ind.App.1983). Goodwill can also be an asset that is assigned a monetary value in the sale of a business. Thus, although goodwill is a function of business reputation, it can be a valued piece of property to a business. It is this economic aspect of goodwill which leads the court to conclude that it is a protected property interest for due process purposes.

of a § 104 order is required because there was no emergency, stated that "in some situations, particularly where the public health is threatened, an administrative agency is permitted to act first and litigate later." *Lone Pine Steering Committee v. EPA*, 777 F.2d 882, 885 (3d Cir.1985). Thus, it may be that both removal and remedial actions are "emergency" actions under the due process clause because of the public interest protected by such action. However, for purposes of this analysis, the court will assume that SCA is correct, and thus view the listing on the NPL as a non-emergency action subject to the general requirement of a pre-deprivation "hearing."

Granting SCA the assumption that it is entitled to a pre-deprivation hearing does not end the matter. SCA believes that it is entitled to a full evidentiary hearing on the accuracy of the HRS score for the Dump. It has not said so explicitly, but that is clearly the thrust of its argument and its request to the EPA. In effect it wants a trial on the HRS score before the listing on the NPL occurs. Yet as was made clear earlier, the due process requirement of "some kind of hearing" has rarely been interpreted as requiring a full evidentiary hearing; in fact, the general rule is that the hearing should be something less. The question for the court therefore becomes (1) was SCA given some kind of a hearing prior to listing on the NPL, and (2) whether that hearing was constitutionally sufficient.

It must be remembered that the overriding concern in procedural due process challenges is that the party whose interest will be deprived must have notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Consistent with this concern, a broad definition of "hearing" would be a procedure whereby the party is given an "opportunity to be heard." In the *Cleveland Bd. of Educ. v. Loudermill* case, that apparently involved an opportunity for the employee "to present his side of the story," because "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental

due process requirement." 105 S.Ct. at 1495.

Applying this definition, it appears that SCA was given a "hearing." According to the undisputed facts of the case, EPA proposed to add the Dump to the NPL by listing it along with 237 other sites in the Federal Register on October 15, 1984. 49 Fed.Reg. 40,320. A sixty-day comment period followed, and SCA submitted comments and more than 170 pages of data and analyses disputing the 42.47 score assigned to the Dump. In addition, a copy of the letter from Joan Bernstein, Vice President and General Counsel for SCA, to Russell Wyer, Director of the Hazardous Waste Control Division of EPA, requesting a hearing before a neutral administrative law judge, indicates that the District Engineer for Waste Management, Inc. sent a letter to Wyer along with a copy of an engineering study by Aztec Associates, Inc. substantiating SCA's claim that the HRS score was incorrect. Clearly, SCA has had an opportunity to "tell its side of the story" and to "present reasons ... why [the] proposed action should not be taken." The court therefore finds that SCA did receive a "hearing" prior to the time that the Dump will be listed on the NPL. The only remaining question is whether that "hearing" was constitutionally adequate.

As noted before, the fundamental concern of due process analysis is whether the party to be injured was afforded notice and opportunity to be heard at a meaningful time and in a meaningful manner. The analysis above indicates that SCA was in fact given notice and an opportunity to be heard; the constitutional sufficiency of that notice and hearing therefore rests on the "meaningfulness" of the time and manner of such notice and hearing.

It appears that the time of the notice and hearing is meaningful because it comes at the earliest possible time after the government indicates that it might seek to include a site on the NPL. Notice comes in the form of the published notice of the proposed NPL; the comment period follows immediately upon the publication of that

notice. Thus, a party in SCA's position has an opportunity to "present its side of the story" before injury to property value caused by a listing on the final NPL can occur.[9]

The manner in which the opportunity to be heard is provided appears to be meaningful as well. The comment period after the proposal to list the Dump on the NPL gave SCA the opportunity to offer its view of the factual underpinnings of the HRS score. SCA apparently took full advantage of the opportunity, providing comments and 170 pages of data and analyses to support its claim that the score is incorrect. An engineering study was also sent to the EPA. Under the *Cleveland Bd. of Educ. v. Loudermill* analysis, that was certainly an opportunity to "present reasons why proposed action should not be taken." Likewise, such opportunity satisfies the Seventh Circuit's description of having "the right to support [one's] allegations by argument, however brief, and if necessary, by proof, however informal." *Endicott*, 644 F.2d at 1216.

Perhaps SCA believes that its "hearing" was inadequate because the EPA would, in a sense, be sitting as prosecutor, judge and jury—in short, that the decisionmaker would not be impartial. SCA has not made this argument explicitly; however, it does seem to lurk beneath the surface of its request that the score be adjudicated before a "neutral tribunal" or "judge," and in its citation to *United Church v. Medical Center Commission*, 689 F.2d 693 (7th Cir. 1982). In that case the Seventh Circuit found that "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant injunctive relief." *Id.* at 701.

However, there is no evidence that EPA would be biased in its review of SCA's submissions. In fact, there appear to be strong disincentives to bias built into the review scheme established under CERCLA. First, EPA has indicated that it is required to consider all submissions made during the comment process, and will address them in its final decision on whether to list the Dump on the final NPL. Second, EPA is charged with administering CERCLA, and more specifically, the Hazardous Substance Response Fund (colloquially referred to as the "Superfund"). The costs of response actions taken by EPA are paid out of the Fund, with the proviso that such expenditures will be recovered if possible from the responsible parties in a § 107 cost recovery action. However, § 107 requires that the expenditures must have been "consistent with the national contingency plan." If EPA were to undertake response actions on a site which did not meet the regulations for placement on the NPL, it would seem that EPA could not recover its costs because such action would be *in*consistent with the national plan. The desire to preserve the Fund and to prevent unnecessary and unrecoverable expenditures of Fund monies would operate as a significant check on EPA decision making. Given a complete lack of any inference of bias on the part of EPA, the court concludes that the fact of EPA's involvement in the review of SCA's submissions during the comment period does not undercut the manner in which the pre-deprivation hearing was provided here. Thus, the "hearing" provided SCA was constitutionally adequate because it provided notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *See McClelland v. Massinga*, 786 F.2d 1205 (1986) (nature and opportunity to request investigation by state agency prior to seizure of tax refund for delinquent child support payments is a "pre-deprivation hearing;" procedure meets requirements of due process).

A slightly different perspective on the adequacy of the hearing provided SCA is found in the Supreme Court's analysis in

---

9. This conclusion is not inconsistent with the court's earlier finding of ripeness. There, a present injury to SCA's property interest was detected because word of the proposed listing eventually leaked to the general public in such a way that the court could presume that customers or buyers in general would know of the possible listing on the NPL. But the passage of such knowledge takes time, and the time for comment occurred immediately after the proposed listing. Thus, it appears that SCA had the opportunity to present its side of the story before any injury to its property value or goodwill could have occurred.

*Mathews v. Eldridge.* In that case, the Court was confronted with the question of whether a full evidentiary hearing was required prior to the termination of disability benefits under the Social Security Act. The procedural mechanism basically involved reviews by state and federal agencies. If the state and federal agency's view of the applicant's condition was such that they thought he was not disabled, the Social Security Administration would inform the beneficiary of its reasons and terminate benefits effective two months after the date of recovery. The beneficiary could get de novo review by the state agency, with review by the Administration, and then get an evidentiary hearing before an administrative judge. The plaintiff in *Mathews* argued that the termination of his benefits prior to the evidentiary hearing was violative of due process.

The *Mathews* Court, after concluding that due process did not always require an evidentiary hearing prior to the termination of benefits, set forth a three-part test for determining whether the administrative procedures used were constitutionally adequate:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903. The Seventh Circuit has called this a balancing test, whereby

a court reviewing the process afforded by the government when a fundamental interest is at stake must weigh (a) the private interest affected by the proceeding and (b) the risk of error inherent in the government's chosen procedure against (c) the interest of the government in using its own procedure.

*Polovchak v. Meese,* 774 F.2d at 735. *See also Miller v. City of Chicago,* 774 F.2d 188, 191 (7th Cir.1985).

One private interest affected by the listing on the NPL is SCA's interest in the use and value of the Dump property. This court has already found that, for ripeness purposes, some injury to this interest has occurred and would occur upon placement on the final NPL. Yet while a minute amount of value decline would be sufficient to make the controversy ripe, the *Mathews* balancing test looks to the severity of the effect on the private interest. The *Mathews* Court justified the holding of *Goldberg v. Kelly,* which requires a full evidentiary hearing prior to termination of welfare benefits, on the grounds that the terminated benefits were life-sustaining. Nothing in the record suggests the same level of importance for the increment of value lost by the proposed or final listing on the NPL. Here, EPA's argument about the effect of the presence of hazardous wastes on the marketability of the Dump has some persuasive force. SCA has never documented the amount of the loss caused by the listing, and there is at least a plausible argument to be made that the Dump would be a difficult piece of property to sell given the wastes already stored there. Thus, while the right to own and use property is an important right, the importance of the private interest subject to deprivation here is attenuated by the fact that the amount of the actual loss itself may not be great and may not be caused solely by EPA's actions.[10]

---

**10.** It is certainly true that the listing process itself is a contributing factor to any property value decline; if one assumes (as the court did in its ripeness analysis) that buyers are sophisticated enough to detect some value in a property because it has not scored over 28.50 on the HRS scale, then the actual listing of a property on the NPL, thereby signifying that the HRS score was greater than 28.50, would chase away those buyers willing to purchase land with some wastes on it. Yet the owner of a hazardous waste storage site cannot bleat piety and point its finger at the EPA; the owner must share some of the blame for owning a site with wastes on it. A site with wastes stored on it is not "like

Damage to SCA's goodwill is subject to a similar analysis. Nothing in the record suggests that SCA's reputation is so pristine or that current customers have such a high regard for SCA that the taint of a listing on the proposed or final NPL will seriously affect SCA's business. The Hulligan affidavit, the only evidence of reputational damage, is very conclusory; it may be sufficient to indicate some damage for ripeness purposes, but fails to establish the extent of the economic effect on SCA's goodwill from the listing—this despite the fact that sixteen months elapsed between the proposed listing and the filing of this lawsuit, which should have revealed to some extent the damage caused by the stigma. Coupled with the court's observation that customers may well be sophisticated enough to know that the listing on the NPL is merely a preliminary step in a process that may yet vindicate a site owner like SCA, the interest in preserving SCA's goodwill is also important but attenuated.

Of course, the court does not mean to belittle the importance of either interest; the economic value of property or reputation can be an integral aspect of a business. Nor does the court's analysis of these interests depend completely on SCA's failure to offer more convincing evidence of its injuries. Rather, both interests may not be very significant—and thus far less than the life-sustaining interests in *Goldberg v. Kelly*—because their very nature suggests limiting factors. The storage of wastes at a site carries with it the value-depressing aspect of the presence of wastes on the site, while the operation of a waste disposal business carries with it customers sophisticated enough to know that mere listing does not necessarily indict a company's effectiveness. Thus, both of these interests are important, but not overly so.

The second stage of the *Mathews* analysis looks to the risk of error in the procedure chosen. *See Califano v. Yamasaki*, 442 U.S. 682, 696, 99 S.Ct. 2545, 2555, 61

L.Ed.2d 176 (1979). What is central to the evaluation of an administrative process is the nature of the relevant inquiry. *Mathews*, 424 U.S. at 343, 96 S.Ct. at 907. The process being challenged here is the EPA's assignment of the HRS score to the Dump and the application of that score in the decision whether to include the Dump on the NPL. The process of assigning a score involves the examination of data in the context of a scoring system; if a certain environmental event occurs, it warrants a certain number of HRS points. The process is relatively objective; the data is collected, then scored. In such a situation, SCA is able to present all of its objections in writing, and a decision about whether the score was accurate can be made on the basis of the written data submitted to EPA.

Precisely because the decision making data is written, there is little need to explore the credibility or veracity of witnesses. In such a situation, the *Mathews* Court held that a full evidentiary hearing was not necessary because the risk of error in deciding the question of eligibility for benefits by use of written submissions is minor. *Id.* at 343–44, 96 S.Ct. at 907. In *West Chicago, IL. v. NRC*, 701 F.2d 632 (7th Cir.1983), the Seventh Circuit rejected a due process claim based upon the alleged insufficiency of allowing only written comments and documentation prior to the issuance of a license. The complainant had wanted a full evidentiary hearing. The *West Chicago* court stated that because resolution of the factual issues raised by complainant "will in large part be based on technical or scientific data that will not necessarily be made more reliable through an oral presentation," due process did not require more. *Id.* at 646. Thus, the risk of error in the EPA's review of comments and submissions appears to be rather low because the nature of the decision to be made is such that the necessary objective data

---

any other piece of property in the United States," as SCA contends, because the presence of the wastes, even at a below-NPL threshold level, has its own value-depressing effect. Thus, the loss in value caused by the listing on the

NPL might not be very much because the mere fact that wastes were stored at the Dump may have already significantly depressed the value of the site.

could be provided through the comment process.

SCA might complain that there is risk of error in the process because there is no oversight of EPA's decision to include a site on the NPL. That, of course, involves the adequacy of post-listing remedies, an issue the court takes up later in this order. A second complaint might be that there is a risk of error because EPA is not a neutral decision maker. However, as indicated before, there is nothing to suggest that EPA is anything other than neutral. In fact, there appear to be neutrality incentives built into the framework in which EPA works. The mere fact that an agency makes the decision in the pre-deprivation hearing does not suggest a great risk of error in the process; if it did, the *Mathews* Court would not have held that review by the Social Security Administration was sufficient prior to the termination of disability benefits. There is nothing to suggest that EPA cannot review environmental data and apply its own regulations to the review of the HRS score.

Further, because of the objective, documentary nature of the data to be used in the decision making process, there appears to be little if any probable value in some other kind of procedure. An evidentiary hearing would not make the fact-finding process any more complete; the documentary data is submitted during the comment process. The only possible benefit from having an administrative judge decide whether the HRS score was justified is that the decision maker would not be the EPA. Yet SCA has presented nothing to support an inference that such a benefit would make any difference to the decision making process.

Thus, the fact that the decision making process for reviewing HRS scores and placing sites on the NPL relies on objective data which can be provided in written form, as well as the lack of any alternative process which adds certainty to the decision itself, strongly suggests that the risk of error in the process is rather small.

The final *Mathews* step involves examining the interest of the government. An examination of the legislative history of CERCLA exhibits a clear concern for protection of the public health and welfare. As noted earlier, CERCLA was enacted to respond to the problem of hazardous wastes because Congress specifically found that "hazardous waste releases can cause harm to public health, safety, and the environment." Report of the Interstate and Foreign Commerce Committee, House Rep. No. 1016, 96th Cong., 2d Sess., at 25 (1980), U.S.Code Cong. & Admin.News 1980, pp. 6119, 6128. It is also clear that the process provided for responding to proposed actions was designed to treat protection of the public health as a high priority:

> Provision is made for public comment and consultation to involve interested parties in the decision-making process to the maximum extent possible. This requirement is not intended to unduly delay action necessary to protect public health or the environment. Formal hearings are not required.

*Id.* at 28, U.S.Code Cong. & Admin.News 1980, p. 6131. Thus, the government's interest in adopting the notice and comment procedure for listing a site on the NPL was to protect the public health from delays caused by other procedures. Certainly, the protection of public health is a vitally important interest of the government. Alternative hearings or procedures—such as a full evidentiary hearing—would jeopardize the public health by preventing needed action from taking place while the parties litigate.

Balancing the three *Mathews* factors, the court finds that there are important albeit attenuated property interests and a low risk of error balanced against a very important government interest in protecting the public health. The court concludes that the *Mathews* analysis supports the view that the hearing provided SCA was constitutionally adequate.

A final perspective of constitutional evaluation focuses on the post-deprivation remedies available to SCA. As the *Cleveland Bd. of Educ. v. Loudermill* Court stated: "The existence of post-termination proce-

dures is relevant to the necessary scope of pre-termination procedures." 105 S.Ct. at 1496 n. 12. EPA's subject matter jurisdiction arguments, in which EPA cited the presence of two statutory remedies, now become relevant. According to EPA, SCA has two places to contest all of the issues raised by the listing on the NPL and the conducting of the RI/FS: a § 113(a) action in the District of Columbia Circuit, and a § 107 cost-recovery action. The court will analyze each of these remedies in turn.

Under § 113(a), the District of Columbia Circuit is given exclusive jurisdiction over review of regulations promulgated under CERCLA. EPA argues that the process of listing a site on the NPL is rulemaking, so that SCA will be able to obtain review of the Dump's listing in that court, and can at that time raise its claims about the HRS score. Thus, EPA concludes, SCA has a forum in which to pursue its challenge to the listing on the NPL.

There is much to suggest that a listing on the NPL is a rulemaking process. As noted in the quotation from the House Report above, proposed remedial action involves a notice and comment period, one of the usual indicia of administrative rulemaking. EPA certainly treats this as rulemaking, and its argument in effect concedes jurisdiction in the District of Columbia Circuit for any challenge by SCA. Every court that has considered the issue of a listing on the NPL has held that it is rulemaking so as to fall within the jurisdictional restriction of § 113(a). See Cotter Corp. v. EPA, 21 Env't Rep.Cas. (BNA) 2231, 2232 (D.Colo.1984); United States Ecology, Inc. v. Carlson, 21 Env't Rep.Cas. (BNA) 2009, 2009 (C.D.Ill.1984); D'Imperio v. United States, 575 F.Supp. 248, 254 (D.N.J. 1983); Tinkham v. Regan, 19 Env't Rep. Cas. (BNA) 742 (D.N.H.1983). The Court of Appeals for the District of Columbia Circuit has acted as though it has jurisdiction; in Eagle-Picher Industries v. EPA, 759 F.2d 922 (D.C.Cir.1985), the court took jurisdiction over several challenges to inclusion on the NPL. See also U.S. Ecology, Inc. v. Carlson, 638 F.Supp. 513, 518 (C.D.Ill.1986) (interpreting Eagle-Picher as making it "clear" that § 113(a) controls a

challenge to the contents and method of compiling the NPL.) Thus, if SCA were to appeal the listing to the District of Columbia Circuit, it appears that it would obtain a review of the listing decision, because the EPA would not oppose it and the Court would hear it.

Nevertheless, SCA contends that listing on the NPL is not rule-making, so that § 113(a) does not come into play. It contends that the four cases cited above are incorrectly decided because the decision to apply the HRS standards to a specific site is an "adjudication," not rule-making, as defined under the Administrative Procedure Act, 5 U.S.C. § 551. In the context of the court's present analysis, this argument can be viewed as arguing that review is not available in the District of Columbia Circuit, and thus such review is not an available post-deprivation remedy.

The rationale for the conclusion of the four courts that listing on the NPL falls within § 113(a) was set forth by the United States Ecology court:

> This court does not have jurisdiction to restrain the publication of the NPL or any portion thereof. The NPL is an integral part of the National Contingency Plan which establishes "procedures and standards for responding to releases of hazardous substances, pollutants and contaminants." 42 U.S.C. § 9605. The Plan was established in accordance with a congressional mandate authorizing the President or his designees "to promulgate any regulations necessary to carry out the provisions of" CERCLA. 42 U.S.C. § 9615.

21 Env't Rep.Cas. (BNA) at 2009. Leaving aside the jurisdictional aspect of this holding, the rationale appears to be that because the NPL is part of the National Contingency Plan (NCP), and because the NCP is a regulation, then the NPL must be a regulation.

While perhaps clumsy in a linguistic or logical sense (SCA disparagingly refers to this argument as calling a cat a "dog" simply because it happens to be standing in a pack of dogs), the court finds that conclu-

sion reached by these cases to be correct. It is important to remember that what the court must do is determine the meaning of the word "regulation" in § 113(a) to see whether a listing on the NPL falls within its bailiwick so as to make post-listing review in the District of Columbia Circuit possible. This involves statutory interpretation of CERCLA, and therefore SCA's arguments on the meaning of terms such as "rulemaking" and "adjudication" within the Administrative Procedure Act are not directly on point. Nothing in the APA indicates that it was intended to define for all times what terms like "regulation" mean in any statute.[11]

Did Congress intend to include NPL listings within the § 113(a) grant or jurisdiction to the District of Columbia Circuit? It is clear that the NCP is, by all definitions, a regulation. SCA does not contest that conclusion. It is also clear that § 105(8)(B) makes the NPL a statutorily-mandated part of the NCP. Precisely because of this statutory inclusion, the NPL is inextricably tied to the NCP as an essential component. This relationship means that a change to the NPL is really a change to the NCP. This conclusion is bolstered by the recognition that the NPL is little more than a "map" or "guide" to where the NCP is going to be applied by listing the "priority" of sites which need attention. To change the list of priorities is to change the focus of the NCP by redirecting its application. Therefore, a challenge to a listing on the NPL is really a challenge to the NCP, a regulation, and thus falls within § 113(a). Congress's construction of the NPL–NCP relationship indicates the desire to include the NPL within the rubric of the NCP, and therefore be subject to § 113(a).

SCA belittles this reasoning, saying that it begs the question of whether the application of the HRS standards to the specific facts of the Dump site is an adjudication or a rulemaking. The argument is based on the application of the APA's distinctions between these terms. This application, however, may not be completely appropriate. The APA defines rulemaking as the process of formulating, amending or appealing a "rule," where rule means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4). Adjudication is the process of formulating an "order," where an order is defined as "the whole or part of a final disposition, whether affirmative, negative, injunctive or declaratory in form, of an agency in a matter other than rulemaking...." 5 U.S.C. § 551(6).

The problem is that the process of issuing a listing on the NPL does not fit well into either definition. A listing on the NPL involves the determination that a certain HRS score has been achieved, which SCA correctly points out is not the usual action of rulemaking (the issuance of general guidelines that are not intended to apply to any particular individual). Yet a listing is not an adjudication because it is not a "final" disposition. As quoted earlier, the Senate Report on CERCLA made clear that the listing does not determine liability, does not reflect a judgment on the acts of the owner or operator, does not require a party to act, and does not in itself give the EPA power to act. It serves "primarily informational purposes." The EPA states that "inclusion of a site on the NPL does not establish that EPA will necessarily undertake response actions." 48 Fed.Reg. 40,658 (September 8, 1983). *See Eagle-Picher Industries, Inc. v. EPA,* 759 F.2d 905, 911 (D.C.Cir.1985) ("Listing does not represent a determination that action is necessary, or that the EPA will take action"). In fact,

---

**11.** Indeed, there is some question of whether the APA would even be applicable to this case. As a general matter, the APA defines what type of procedural amenities are required in a rulemaking or adjudication situation. For example, 5 U.S.C. § 553 requires that rulemaking involve a notice and comment period, while § 554 requires that, if a statute mandates an adjudication "determined on the record," certain notice and hearing procedures are mandated. The APA gives a cause of action for the failure of an agency to comply with these procedural requirements, but that would be irrelevant here.

the only real substantive effect of a listing is that it makes the property eligible for possible remedial action. In short, it is simply the first in a series of steps to deal with a perceived problem on the site property—hardly a "final determination."

SCA cites two cases which it claims hold that an "adjudication" is the application of general law or rules to specific facts: *York v. Secretary of Treasury*, 774 F.2d 417 (10th Cir.1985) and *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872 (1st Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978). However, the court in *York* held that the determination that a certain gun was a machine gun under a statute was not rulemaking because it applied general rules to specific facts. It found the existence of an "adjudication" by holding that, because the decision was not rulemaking, it must be an adjudication. Such reasoning cannot be used in all situations: "... [adjudication] does not encompass all forms of agency action other than rulemaking. If the action in question does not lead to a 'final disposition' by the agency, it may not be an adjudication." *Bricklayers, Masons and Plasterers International Union v. NLRB*, 475 F.2d 1316, 1319 (D.C.Cir.1973). *See also Earthline Co. v. Kin-Buc, Inc.*, 21 Env't Rep.Cas. (BNA) 2161, 2162 (D.N.J.1984) (issuance of a § 106 order is not "final agency action" under 5 U.S.C. § 704 because the order is "merely a prerequisite to agency action, which by itself has no independent legal significance," citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 147, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1966)). The fact that the listing on the NPL is such a preliminary step, where further agency action may or may not be commenced in the future, means that these cases simply do not support the claim that a listing is an adjudication. Further, even if the cases could support the conclusion that a NPL listing is an adjudication, they do not prove that Congress did not intend to include the listing process with § 113(a) review. The structure of § 105 of CERCLA leads the court to conclude that Congress intended listing to fall within § 113(a).

Thus, review of a decision to list a site on the NPL is available in the District of Columbia Circuit once the final NPL is published. In such a proceeding, SCA would be able to challenge the factual underpinnings of the HRS score as part of an attack on the listing itself. If SCA is correct, and the listing is based on a "demonstrably false factual claim," then the District of Columbia Circuit would be able to reverse or remand the listing decision. This post-listing procedure gives an additional avenue by which SCA can press its claims.

EPA claims that a second post-listing remedy exists in the form of a § 107 action. If EPA lists the Dump on the NPL, it will proceed with the RI/FS and then, if appropriate, undertake remedial action. When that work is finished, EPA would most likely bring a § 107 cost recovery action to obtain the costs of the remedial actions from SCA. While § 107 imposes strict liability, there are nevertheless certain strictures on the ability of EPA to recover its costs. Section 107(a)(4)(A) and (B) both allow for recovery of costs that are consistent with the NCP. This requirement for consistency imposes a limit on the government's right to recover, *J.V. Peters & Co., Inc. v. EPA*, 767 F.2d 263, 266 (6th Cir. 1985). In addition, § 107

> provides an adequate opportunity for the alleged responsible parties to object to the cost and adequacy of response actions ... Continued monitoring of the EPA by the allegedly responsible parties and the prospect of a [§ 107] trial are adequate safeguards to insure that the agency gives serious consideration to objections and comments by the parties. The reimbursement trial will not be a pro forma proceeding but will permit presentation of adequate evidence for careful and exacting study by the court.

*Lone Pine Steering Committee*, 777 F.2d at 887. *See also United States v. Outboard Marine Corp.*, 789 F.2d 497, 505–506, (7th Cir.1986) (requirement of consistency with the NCP permits defendant to raise cost-effectiveness defense in § 107 action). Therefore, SCA should be able to challenge the propriety of EPA's actions thoroughly in a § 107 trial.

SCA argues that § 107 actions are inadequate for two reasons. First, they do not occur for a long time after the listing on the NPL. However, the entire panoply of procedures available under CERCLA must be considered. SCA had an initial opportunity to challenge the proposed listing during the comment period following publication of the proposed NPL. After the final listing is announced, SCA can challenge the listing decision in the District of Columbia Court of Appeals. Finally, after the EPA has completed its remedial work, SCA can again challenge the listing as being inconsistent with the NCP within the context of a § 107 action brought by EPA. In short, the § 107 action would be SCA's third bite at the apple, and thus the fact that it does not occur promptly after the listing decision is much less important to the due process calculus.

Second, SCA complains that both § 107 and § 113(a) are inadequate because they do not provide a mechanism through which it can recover damages for the losses it suffered (in decreased property value) if one of these later reviews of the listing decision find that the Dump should not have been listed. It appears that SCA believes that due process requires full compensation, which the court finds to be an incorrect view of the law. Due process is not designed to assure compensation for all losses; it is designed to minimize the risk that a party will have property or liberty interests deprived by an arbitrary act of government. Thus, in *Mathews*, the Court was not concerned about whether the subsequent evidentiary hearing available to a recipient provided damages for lost interest, or potential emotional distress, caused

by an erroneous decision to terminate benefits;[12] the *Mathews* Court was only concerned with whether there was sufficient protection for the participant's right to the benefits so that it was constitutionally proper to terminate those benefits after administrative review and before the hearing provided under the program. Due process is satisfied when the procedure which will deprive property interests provides notice and the opportunity to be heard at a meaningful time and in a meaningful manner. Thus, under due process analysis, § 107 and § 113(a) should not be considered inadequate merely because they might not provide full compensation to SCA. Precisely because they both offer further opportunities for SCA to challenge EPA's actions, those post-listing remedies are adequate.[13]

Thus, the court finds that the provisions of CERCLA relating to the listing of a property on the NPL satisfy the requirements of due process. In and of itself, the listing process provides a notice and comment period, which gives the opportunity to be heard at a meaningful time and in a meaningful manner prior to any property deprivation. In addition, this pre-listing "hearing" satisfies the *Mathews* test. Finally, the existence of two independently adequate post-listing remedies in a § 113(a) review in the District of Columbia Circuit and a § 107 cost recovery action give further support to the conclusion that the pre-listing notice and comment period is a constitutionally adequate hearing for due process purposes. Therefore, SCA's due process rights were not violated by the NPL listing process at issue here. Thus, summary judgment must be granted the EPA on the due process claim.[14]

12. The disability benefits program did, however, allow for recovery of benefits not paid during the period of the appeals.

13. This same analysis defeats SCA's complaint that it cannot bring a § 107 action to recover its costs for either a clean up or damages suffered as a result of an erroneous listing on the NPL. It appears both of these arguments are directed to the issue of compensation, which is simply an inappropriate consideration for this stage of the due process analysis.

14. SCA has argued that "the few courts that have examined the issue" (Reply Memorandum, p. 7) have been troubled by the constitutionality of CERCLA. In fact, one circuit court found no due process problem with the structure of CERCLA. *See J.V. Peters & Co., Inc.*, 767 F.2d at 266 ("Plaintiffs also argue that the requirements of due process compel a judicial determination of propriety prior to a response action. They can suffer no deprivation until the adjudication of the section 107 litigation, however, and they will have full opportunity to argue liability at that time.") The two cases cited by SCA, *Indus-*

## B. Violation of the Separation of Powers Doctrine

It is an accepted tenet of constitutional law that the powers of the three branches of the federal government are intended to be separate; encroachment by one branch upon the powers of another is forbidden by this requirement of the separation of powers. In the case of the executive branch, of which the EPA is a part, the accepted rule is that the executive's power to act must stem from the Constitution or from an act of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

SCA contends that the separation of powers doctrine has been violated in two ways by the EPA's decision to conduct the RI/FS at the Dump site. The first relates to the negotiations between SCA and EPA over whether SCA would be able to conduct the RI/FS and perform the remedial clean up on its own. SCA argues that EPA tried to force illegal conditions on SCA's right to perform the work itself. The second relates to the performance of the RI/FS prior to the time that the Dump is listed on the NPL. SCA believes that EPA has no statutory authority to begin performing the RI/FS until such time as the Dump is in fact listed on the final NPL. The court will consider each of these claims in turn.

### 1. Illegal Conditions on the Right to Perform the RI/FS

In May 1985, the EPA sent a letter to SCA apparently seeking to find out whether SCA would be interested in performing the RI/FS and the potential clean up of the Dump site. As part of the proposal it submitted, EPA sought to have SCA sign a consent order in which SCA would admit § 106 had been satisfied. This § 106 consent order would have the effect of stating that an "imminent and substantial" danger existed at the Dump site. In addition, the consent order would require SCA to submit an acceptable plan by which the clean up would proceed, but SCA's obligations under the plan could be changed at any time. Thus, signing the consent order would require SCA to undertake a financial obligation that could potentially be quite large (what SCA has termed an "open-ended" financial obligation).

SCA indicated a desire to do the RI/FS and clean up work but refused to accept these two conditions on what it considered its "right" to do the work. If an "imminent and substantial" danger existed at the site, SCA believed that EPA should have sought a § 106 order on its own. But if no such danger existed, SCA argued that it should not be forced to sign a consent order under § 106, in effect giving EPA jurisdiction which EPA did not otherwise have. SCA likewise felt that the open-ended financial obligation was unauthorized. After negotiations for about three months, EPA decided that SCA would not adequately perform the RI/FS and clean up work in an acceptable manner, and therefore decided to proceed with the RI/FS on its own.

SCA contends that EPA's "forcing" of the signing of a § 106 order and the requirement that SCA sign an open-ended financial obligation violates the separation of powers doctrine because neither is authorized by CERCLA. The argument that CERCLA contains no authorization is based in large part on SCA's belief that it has a statutory "right" to be given the opportunity to perform the RI/FS and clean up work before EPA attempts to do so, and thus placing these "illegal" conditions on that right was not authorized.

---

trial *Park Development Co. v. EPA*, 604 F.Supp. 1136 (E.D.Pa.1985), and *Aminoil, Inc. v. EPA*, 599 F.Supp. 69 (C.D.Cal.1984), are not addressed to the issues before this court. *Industrial Park* was concerned with the EPA's ability to stop a private party's clean up of a site, thereby taking over the remedial action itself, without a hearing or proceeding on the record. *Aminoil* involved the failure to provide a hearing on § 106(b) daily penalties or § 107 treble dam-

ages; the court felt that due process might be violated by having to wait until a § 106 enforcement or § 107 cost recovery action was brought. This case simply does not involve these shortcomings with CERCLA; the availability of comment prior to listing, review by the District of Columbia Circuit, and review by a district court in a § 107 action gives SCA much more process than the plaintiffs in *Aminoil* and *Industrial Park*. Thus, those cases are inapposite.

SCA provides only one citation to any authority in support of its claim that it has a statutory right to perform the remedial work—the comments of CERCLA sponsor Representative Florio in response to a concern of Congressman Stockman:

[H]e has also expressed apprehension EPA is going around to automatically start cleaning things up and suing someone. That situation is not going to occur because EPA is required not to act if the responsible party or parties will take appropriate action to clean up and contain these sites.

126 Cong.Rec. H9467 (September 23, 1980). SCA does not cite where in the statute its "right" to perform the work is set out, and perhaps with good reason; there is no unfettered right to perform the remedial work given to owners or operators of sites. Section 104(a)(1) requires the President to undertake response action, consistent with the NCP, which the President deems necessary to protect the public health or the environment "unless the President determines that such removal or remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release eminates...." The EPA regulations under § 104 recognize this same requirement that EPA determine that the response action "will be done properly" by the owner or operator of the site. 40 C.F.R. § 300.61(b). Thus, far from having a right to perform the work on its own terms, SCA's conduct of the RI/FS and clean up are dependent on the EPA determining that SCA will properly conduct the study and response action. Further, it seems that the only way to assure that a private party will properly conduct response work is to require that party to meet certain conditions which EPA believes will guarantee that the work is done correctly. Thus, implicit in the statutory requirement that the President act unless he determines that a private party can properly do the work is the power to set conditions on that private party's work. *See United States v. Outboard Marine Corp.,* 789 F.2d 497, 503–504, (while government would "certainly prefer" private party clean up, EPA has "discretion" to decide that it will expend public funds to clean up a site).

SCA's first complaint is directed at EPA's insistence that SCA sign a § 106 consent order. EPA contends that § 106 is the only source of authority in CERCLA for EPA to enter into judicially enforceable agreements with private parties, and therefore this condition was necessary for any agreement to allow SCA to clean up the site. This appears to be a rather crabbed reading of CERCLA; the language of § 106 does not directly provide for the entering of contracts, so that EPA's belief that § 106 gives it power to enter contracts is based on a certain interpretation of the section. Why EPA cannot find the same interpretation in the language of § 104, which specifically allows the President to let private parties perform response activities, and requires a finding that the parties will "properly" do the work, is a mystery to this court. Nevertheless, the court does not find this condition on SCA's performance of the RI/FS and clean up to be constitutionally impermissible. Section 104 gives EPA the right to condition private response work; the key is that EPA must be satisfied that the work will be done properly. By requiring SCA to enter a § 106 order, EPA would have a solid jurisdictional basis for taking over the work should SCA fail to perform it properly. In addition, jurisdiction under § 106 would make available the fine provisions of § 106(b), thereby giving EPA a certain leverage to assure that SCA does not perform inadequately.

The second complained-of condition is the open ended financial obligation. Here, EPA is on very solid ground. At this point in time, prior to the completion of the RI/FS, the full extent of the problem at the Dump site has not been fully documented. To enter into an agreement whereby SCA's clean up costs were fixed would be to run the risk that the response effort of SCA would not be complete. EPA must be assured that whatever it takes to conduct a complete remedial action will be forthcoming from the private party. Thus, an open ended financial obligation is an important—

indeed, essential—condition on any private party's performance of the RI/FS and response work.

The court therefore finds that EPA was acting within the parameters of CERCLA when it put conditions on SCA's proposal to do the RI/FS and response work. Thus, there was a statutory basis for EPA's action, so that the separation of powers doctrine was not violated.[15]

### 2. Performance of the RI/FS Prior to Listing on the NPL

SCA's second separation of powers argument is that EPA has no authority to conduct the RI/FS prior to the time that the Dump is listed on the NPL. According to SCA, the EPA has limited its discretion to perform remedial actions to those sites which are listed on the NPL. *See* 40 C.F.R. § 300.68(a). Because this is not a removal situation under § 106 or § 104, the RI/FS is being performed prior to remedial action, and therefore the RI/FS itself is a remedial action. Performing the RI/FS prior to listing is therefore outside the limits of EPA's authority.

The essential premise to SCA's argument is that a RI/FS for planning remedial action is itself remedial action. However, CERCLA disproves that premise. In § 101(23), the definition of "removal" includes "such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances ..." as well as "action taken under § 104(b)...." Section 104(b) allows the President, whenever he has reason to believe that a release has occurred or is about to occur, to "undertake such investigations, monitoring, surveys, testing and other in-formation gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof...." Thus, CERCLA clearly makes the conduct of a RI/FS a removal, not remedial, action, so that the restriction that remedial actions be taken only when the site is on the NPL is simply irrelevant to a RI/FS.

SCA attempts to argue that EPA has always required that a RI/FS be conducted only when the site is on the NPL, although it recently changed its mind so that a pre-listing RI/FS can be conducted in limited situations. SCA cites the following language:

Generally, EPA does not perform RI/FSs at sites until they have been included on the NPL. Sometimes, however, these studies are performed at sites that have been proposed but have not been promulgated at the time the study commences. This can happen for a number of reasons. First, these studies may be performed in preparation for a possible removal or enforcement action. Sites need not be on the NPL to qualify for removal or enforcement actions. Second, these studies may be performed preparatory to a remedial action if EPA believes either: (a) That a site proposed for the NPL is likely to be promulgated and that delay in commencing the studies may create unnecessary risks to public health or welfare or the environment; or (b) that a proposed site may be promulgated on the NPL, but that delay may cause a particularly serious risk of harm to public health or welfare or the environment.

---

15. SCA has also argued that the conditions on its right to perform the response work itself placed SCA on the horns of a dilemma. If SCA acceded to the conditions, and performed the work itself, it would spend its money without ever having a right to contest the EPA's actions in a § 107 cost recovery action. If SCA refused to accept the conditions, then EPA would perform the work, which SCA asserts (without support) means that EPA will engage in much more expensive methods of action, and which SCA will have to pay in an eventual § 107 action.

Neither argument is persuasive. As noted above, SCA has at least two opportunities to contest the EPA actions: during the notice and comment period, and during the District of Columbia Circuit's § 113(a) review of the listing on the NPL. While SCA might not be able to bring a § 107 action, it certainly has sufficient opportunity to challenge the EPA's actions. If EPA performs the work, then SCA gets the benefits of the § 107 action to contest the appropriateness of the expenditures, as well as the additional opportunity to contest the appropriateness of EPA's actions. As the court sees it, this dilemma does not pose any problem to SCA.

50 Fed.Reg. 47927 (November 20, 1985). SCA contends that this language sets out prerequisites for action, and because EPA did not give notice that either of these two conditions were present, EPA was acting outside of its authority when it began the RI/FS on the Dump prior to a listing on the NPL.

The court concludes that SCA reads far too much into this Federal Register excerpt. Elsewhere in that same published notice, EPA made it clear that it "disagrees" with the view that a site must be on the NPL, and that EPA "never intended that restricting Fund-financed remedial actions to NPL sites would apply to remedial investigations or feasability studies...." 50 Fed.Reg. 47926 (November 20, 1985). The excerpt quoted above appears intended more to set out some (though not necessarily all) examples of when a RI/FS might be undertaken prior to a listing. It does not set out limits of EPA discretionary authority, nor does it require notice to SCA that the Dump meets any of those specific conditions. Even if the excerpt somehow limited EPA's removal authority to conduct a RI/FS, it is clear from EPA's comments about the Dump that it believes the site will likely end up on the NPL and that a delay in the study would create unnecessary health risks, the first part of the second exception noted above.

The court therefore concludes that EPA's decision to begin the RI/FS even though the Dump is not on the NPL was not barred by the requirement that remedial actions be limited to sites on the NPL because a RI/FS is in fact a removal action under CERCLA. Thus, the separation of powers doctrine is not violated by EPA's actions. Given that both SCA claims based on the separation of powers doctrine fail, the court will grant EPA summary judgment on these claims.

### DISPOSITION OF OTHER PENDING MOTIONS

Because the court has ruled on the merits of the claims raised by SCA, and specifically ruled against SCA on all claims, SCA's motions for a preliminary injunction and temporary restraining order must be denied as being moot.

### CONCLUSION

For the reasons set forth above, plaintiff's motions for preliminary injunction and a temporary restraining order are hereby DENIED as MOOT. Defendants' motion to dismiss for lack of subject matter jurisdiction is hereby DENIED. The defendants' motion to dismiss for lack of ripeness is hereby GRANTED as to the claims relating to the entry of defendants onto plaintiff's property to conduct a RI/FS, and is hereby DENIED in all other respects. Defendants' motion to dismiss for failure to state a claim, converted into a motion for summary judgment, is hereby GRANTED as to all remaining claims, and plaintiff's motion for summary judgment is hereby DENIED.